# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **BETH ANN GOLDSBERRY,** | ) |
| | ) |
| Plaintiff, | )    Case No. 06 C 1268 |
| | ) |
| v. | )    Magistrate Judge |
| | )        Martin C. Ashman |
| **MICHAEL J. ASTRUE,** Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Beth Ann Goldsberry ("Goldsberry"), seeks judicial review of a final

decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the

Commissioner"), denying her claim for Supplemental Security Income ("SSI"). Before this Court

are Plaintiff's Motion to Reverse the Final Decision of the Commissioner of Social Security and

Defendant's Motion for Summary Judgment. The parties have consented to have this Court

conduct any and all proceedings in this case, including the entry of final judgment, pursuant to 28

U.S.C. § 636(c) and Local Rule 73.1(c). For the reasons that follow, the Court grants Plaintiff's

motion in part and denies it in part. The Commissioner's Motion for Summary Judgment is

denied, and the case is remanded to the Commissioner for further proceedings consistent with

this opinion.

# I. Background

## A. Procedural History

Beth Ann Goldsberry filed for SSI benefits on March 4, 2002, claiming that she was disabled as a result of bipolar disorder. (R. at 129, 136.) When the Social Security Administration ("SSA") denied her claim on June 20, 2002, Goldsberry filed a request for reconsideration, which was denied on November 15, 2002. (R. at 114, 122, 123.) Goldsberry next filed a request for a hearing before an administrative law judge ("ALJ"). (R. at 127.) ALJ John L. Mondi held a hearing on December 17, 2003, at which Goldsberry testified, as did her roommate Jim Malloy. (R. at 374-405.)

After the ALJ rendered an unfavorable decision, Goldsberry appealed to the Appeals Council of the SSA. (R. at 36.) The Appeals Council remanded the case to the ALJ, and a supplemental hearing was scheduled for November 3, 2004. (R. at 36, 369.) The November 3 hearing was continued to December 8, 2004, after Goldsberry failed to attend the hearing due to what her attorney described as a "psychotic attack." (R. at 369, 373, 335.) Goldsberry later testified that she was unable to be present on November 3 because she had "shut down" after a fight with her roommate and "couldn't do nothing then." (R. at 346.) At the December 8 hearing, Goldsberry testified again, as did GleeAnn Kehr, a vocational expert ("VE"). (R. at 335.) The ALJ once again rendered an unfavorable decision, and the Appeals Council declined Goldsberry's request to review the case, making the ALJ's decision the final decision of the Commissioner. (R. at 15-22, 6-12.) Goldsberry now appeals the decision to this Court.

## B.    Factual Background

Beth Ann Goldsberry is a forty-five-year-old woman who claims that she has been disabled as a result of bipolar disorder since May 25, 2001. (R. at 129, 136.) She is five feet four inches tall and weighed about 140 pounds at the time of the December 8, 2004, hearing. (R. at 136, 339.) She is a United States citizen, divorced with no minor children, who resides in Warrenville, Illinois. (R. at 130.) She attended high school but did not complete the twelfth grade. (R. at 142.) She does not have a GED or any specialized vocational training. (Id.) Her relevant work history consists of bartending at a Moose lodge and a VFW hall and working as a dietary aide in an elderly care facility. (R. at 137.) Goldsberry's last employment, which ended in 2001, was as a bartender at a VFW hall. (R. at 383.) She left that job as a result of what she described in her testimony as "harassment" by the quartermaster. (Id.) Goldsberry testified that, after the quartermaster refused to get five-dollar bills for her while she was busy, she "couldn't take it any more," started crying, and walked off the job. (Id.)

### 1.     Medical History: Community Counseling Center of the Fox Valley

There is no dispute that Goldsberry suffers from bipolar disorder. In her claim for SSI benefits, Goldsberry indicates that she began to experience symptoms of bipolar disorder in 1985. (R. at 136.) She began seeing a psychiatrist, Dr. Rao, at the Community Counseling Center of the Fox Valley in 1990. (R. at 327.) Goldsberry also testified that she had been hospitalized on three occasions as a result of her mental illness, with the last hospitalization taking place in 1997. (R. at 385-86.) The record contains numerous progress reports from

- 3 -

Dr. Rao dating from approximately October 2000 through October 2004. As of December 2003, Goldsberry was seeing Dr. Rao approximately once a month for "medication management" and seeing a therapist approximately twice a month. (R. at 327.) Pharmacy records show that Goldsberry's bipolar disorder has been treated with drugs such as lithium, Klonopin, Risperdal, Zyprexa, Trazadone, Xanax, Wellbutrin, and Trileptal. (R. at 171-80.)

The records of Goldsberry's treatment by Dr. Rao and her therapists at the Community Counseling Center of the Fox Valley are too numerous to discuss individually. Taken as a whole, these progress reports paint a picture of a patient whose symptoms are at times controlled by medications, but periodically become uncontrolled. The reports for the year 2001 are illustrative. In January 2001, Dr. Rao reported that Goldsberry was feeling "increased energy" and "racing of thoughts" along with "being irritable, angry, [and] upset easily." (R. at 236.) He also described her as "somewhat manic." (Id.) Subsequent reports indicate that Goldsberry was responding favorably to treatment. On January 25, 2001, Dr. Rao noted that Goldsberry was feeling better after an increase in her lithium, while her therapist, Linda Voelker, observed that "[c]lient seems to be functioning quite well." (R. at 234-5.) Similarly positive reports appear in February, March, and May of 2001. (R. at 209, 227, 229, 230, 232, 233.) Yet in June 2001, Goldsberry reported that she was sleeping sixteen to eighteen hours per day, feeling depressed after quitting her job, and experiencing "decreased appetite, a lot of crying spells, being irritable, angry, upset easily." (R. at 226.) By September 2001, Goldsberry reported that she was doing well after taking Klonopin for her anxiety and Dr. Rao noted that "marginally, she is functioning." (R. at 223.) In October, she was again suffering from racing thoughts, mood

- 4 -

swings, and depression; by the end of December, she was "feeling better" and looking for a job. (R. at 219, 222.)

On December 3, 2003, Dr. Rao completed a Mental Impairment Questionnaire detailing Goldsberry's condition. (R. at 100-105.) He indicated that Goldsberry suffered from bipolar disorder and that her symptoms included poor memory, appetite disturbance, sleep disturbance, mood disturbance, emotional lability, social withdrawal, decreased energy, manic syndrome, generalized persistent anxiety, anhedonia, panic attacks, feelings of worthlessness, psychomotor agitation, difficulty thinking or concentrating, and hostility/irritability. (R. at 100.) Dr. Rao rated Goldsberry's capacity to "deal with normal work stress," "set realistic goals or make plans independently of others," "deal with stress of semiskilled and skilled work," "travel in unfamiliar places," and "use public transportation" as "poor or none." (R. at 103-104.) Dr. Rao rated Goldsberry's abilities as "good" or "fair" in all other categories. (R. at 103-104.) He indicated that she had "marked" limitations in her ability to carry out the activities of daily living and to maintain social function. (R. at 104.) Dr. Rao noted that Goldsberry experienced "frequent" deficiencies of concentration resulting in a failure to complete tasks in a timely manner as well as one or two episodes of "deterioration or decompensation in work or work-like settings." (Id.)

Dr. Rao reported that Goldsberry was fully oriented, displayed good grooming and hygiene, and had no formal thought disorder, but that her mood at the time of his report was anxious and her attention and concentration were poor. (R. at 101.) He also noted that her insight and judgment were fair, but her recent memory was impaired. (Id.) He wrote that she had "not responded well with medication" and that her prognosis was "guarded." (R. at 101-102.) Dr. Rao predicted that Goldsberry's impairments would cause her to miss work more

- 5 -

than three times per month. (R. at 102.) Despite these impairments, however, he gave her a GAF score of 55, which is squarely in the middle of the "moderate" symptoms range according to the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). (R. at 100; DSM IV-TR 32 (4th Ed. 2000).) In October 2004, Dr. Rao added a note to his report indicating that Goldsberry's symptoms had worsened and her functioning had declined. (R. at 105.)

## 2. Medical History: Consultative Examination of Dr. Nemeth

On May 13, 2002, Goldsberry was examined by Dr. Nemeth, a psychiatrist, to whom she was referred by the Disability Determination Service ("DDS") for a consultative examination ("CE"). (R. at 197.) Dr. Nemeth noted that Goldsberry felt she was unable to work and that she complained of a mood disorder that caused her to experience periods of heightened energy and aggression coupled with periods of depression and anxiety. (Id.) Goldsberry reported that her mood disorder affected her ability to relate to other people, causing her to be more isolated, and that she needed assistance in daily life activities such as laundry, shopping, and chores. (Id.) She also reported that her mood swings and difficulty in concentrating had intensified over the years and made it difficult for her to maintain employment or personal relationships. (R. at 198.)

Upon examination, Dr. Nemeth found that Goldsberry was emotionally labile and characterized her speech as "pressured and rapid." (R. at 198.) Her speech "alternated with periods of crying spells." (Id.) While she was well-oriented to time and place and denied hallucinations, delusions, and paranoia, Dr. Nemeth found that Goldsberry's concentration and attention span were poor. (Id.) Dr. Nemeth diagnosed Goldsberry with "bipolar disorder, mixed type, severe," and noted that "she appears incapable of handling her own funds." (Id.)

- 6 -

### 3.   Medical History: NAL Capacity Assessment and PRTF

In June 2002, Dr. David Brister of the DDS performed a NAL capacity assessment of Goldsberry and completed a Psychiatric Review Technique Form ("PRTF"). (R. at 243-60.) Dr. Brister's findings were subsequently reviewed and confirmed by Dr. Erica Altman on November 4, 2002. (R. at 247.) Dr. Brister accepted Dr. Nemeth's finding that Goldsberry suffered from bipolar disorder. (R. at 245.) In the NAL assessment, he found that Goldsberry's ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration were "moderately limited." (R. at 243.) Dr. Brister also rated Goldsberry's ability to interact appropriately with the general public as "moderately limited." (R. at 244.) Based on these limitations, Dr. Brister found that Goldsberry was limited to employment involving simple, repetitive tasks in "socially restricted vocational settings." (R. at 245.)

On Goldsberry's PRTF form, Dr. Brister indicated that Goldsberry's bipolar disorder was a medically determinable impairment under Listing 12.04 ("Affective Disorders"). (R. at 247.) In Section III of the PRTF, Dr. Brister rated Goldsberry's difficulties in maintaining social functioning as "mild," and found that she had "moderate" restrictions in her activities of daily living and "moderate" difficulties maintaining concentration, persistence, or pace. (R. at 257.) Dr. Brister also noted that there was insufficient evidence to determine how many episodes of decompensation Goldsberry had experienced. (R. at 257.) Dr. Brister concluded that the evidence did not establish the presence of the "C" criteria of Listing 12.04. (R. at 258.)

### C. Goldsberry's Testimony

At hearings before the ALJ on December 17, 2003, and December 8, 2004, Goldsberry testified regarding her bipolar disorder and its impact on her life and ability to work. Goldsberry testified that she had not worked since 2001, when she quit her job as a bartender at a VFW hall, except for one week of employment as a secretary at an accountant's office. (R. at 382.) She left the secretarial job because she "couldn't take it" when the accountant's clients would arrive at the office for appointments and the accountant was not there. (Id.) She quit the bartending job, which she had held for approximately eighteen months, because the quartermaster "harassed" her, refused to apologize, and refused to get five-dollar bills for her while she was busy. (R. at 383.) Goldsberry described her response to this treatment as follows: "I started crying, I couldn't take it anymore and I walked out." (Id.) When asked about prior employment, Goldsberry described another bartending job at a Moose lodge, which she left in order to tend bar at the VFW. (Id.) She also testified to working as a dietary aide for six or seven months and that she left that job because it involved "a lot of tasks" and the stress of her various tasks "was just too hard." (R. at 338.)

With respect to her lifestyle, Goldsberry denied any drug or alcohol abuse, stating that she never liked alcohol and that she had not used marijuana since 1990. (R. at 387-88.) She stated that she lived with her friend Jim, but that she had no contact with other friends, claiming that "[m]y friends hurt me and I stay away from my friends." (R. at 388-89.) She knew that her son lived in Aurora, but she had not seen him in two years. (R. at 389.) Goldsberry stated that on a normal day she gets out of bed, drinks some milk, takes her medicine, and returns to bed to watch movies. (R. at 388.) She testified that she ordinarily does not change out of the clothes she

sleeps in. (R. at 395.) She estimated that she cooks dinner six times per year. (Id.) Her only household activity is cleaning, but she can only clean for about one and one-half hours, three times per week, before the work becomes "too much." (R. at 396-97.) When asked if she was capable of doing a simple manual task for a prolonged period of time, Goldsberry replied: "No, I'd probably be up the wall somewhere." (R. at 397-98.) Her trips outside the house are limited to grocery shopping once a month and visiting her boyfriend "once or twice a week." (R. at 341.)

When asked by the ALJ to describe how her mental health problems affect her ability to work, Goldsberry replied: "I can't deal with anything let alone people . . . . [M]y lithium helps but I'm still like a light switch, up and down, I have no middle. I'm up and down, up and down. And just can't handle people [sic], I don't even go anywhere." (R. at 384.) She described experiencing anxiety that causes emotional and physical distress, sleeplessness, and a propensity to be "mean," all of which are somewhat controlled by her medications. (R. at 392-94, 399.) As a side effect of her medications, she suffers from tremors every morning. (R. at 339.) Goldsberry also testified that she has problems with both short- and long-term memory, becomes upset over "relatively trivial" events, suffers from crying spells, and does not care to be around other people. (R. at 345-47, 356.) She recalled being hospitalized a total of three times as a result of her mental illness, with the last hospitalization in 1997 or 1998. (R. at 340, 385.) At the December 2004 supplemental hearing, she stated that she had "been pretty bad" recently and that Dr. Rao had suggested several times that she be hospitalized for treatment. (R. at 340, 358.) Goldsberry also said, however, that there had not been any changes for better or for worse in her condition since the previous hearing. (R. at 342.)

### D.    The Vocational Expert's Testimony

GleeAnn Kehr, a vocational expert ("VE"), also testified at the December 8, 2004, hearing. Her testimony was based on her review of the documents that had been received into evidence as well as her personal observation of the testimony at the supplemental hearing. (R. at 360.) The VE first classified Goldsberry's prior employment in terms of skill and exertional levels. (Id.) The VE testified that Goldsberry's work as a bartender and her work as a dietary aide in an elderly care center would both be classified as light, unskilled labor. (Id.)

The ALJ then presented the VE with several hypothetical questions, asking her to assume for each hypothetical that the individual in question had the same past work experience and education as Goldsberry and was the same age. (R. at 360-61.) The ALJ first asked the VE to assume that the individual had the limitations identified by the DDS physicians. (R. at 361.) These included moderate limitations in the ability to understand and remember detailed instructions, the ability to maintain attention and concentration for extended periods, and the ability to interact appropriately with the general public, as well as a requirement that work be limited to simple, repetitive tasks in socially restricted settings. (Id.) The VE answered that an individual with Goldsberry's background under those restrictions would not be able to return to any past work. (Id.) Such an individual would, however, be able to perform other jobs involving simple, repetitive tasks in more isolated social settings. (Id.) The VE identified three jobs that the individual could perform: assembly (with approximately 3,000 jobs in the Chicago metropolitan area), packaging (approximately 2,000 jobs), and sorting (approximately 2,000 jobs). (R. at 361-62.) The VE testified that the numbers she provided reflected only sedentary

positions, and that more jobs existed within each category at the light and medium exertion levels. (R. at 362.)

The ALJ next asked the VE to assume that the individual had the limitations indicated by Dr. Rao in his RFC assessment. (R. at 362.) The VE responded that the marked limitations in the activities of daily life and social functioning, frequent deficiencies in concentration, persistence, and pace, and episodes of deterioration identified by Dr. Rao "would certainly preclude work" even in the unskilled category. (R. at 362-63.) She also noted that Dr. Rao's projection of more than three absences from work per month was "in excess of what would be the allowable time for someone to miss work over the course of the work year." (R. at 362.)

Finally, the ALJ asked the VE to assess Goldsberry's vocational outlook, given her background, age, and education, and taking all of her testimony about her symptoms to be true. (R. at 363.) The VE identified two significant limitations based on the testimony at the hearing. (Id.) First, Goldsberry's testimony indicated that she was only able to force herself to do work for 30 to 60 minutes per day. (Id.) The VE testified that this limitation alone would preclude full-time employment. (Id.) The VE added that Goldsberry's testimony regarding the effects of her mental illness, including "her getting upset to the point, where even though she'd planned on going out, she'd crawl back into bed," indicated that she would miss more than the allowable number of workdays per year, precluding work. (Id.)

- 11 -

## II.  The ALJ's Findings

In an opinion dated April 28, 2005, the ALJ made the following findings:

1.  The claimant has not engaged in substantial gainful activity since at least the filing of her application on January 17, 2002, with her last bartender work having ended in June 2001.

2.  The claimant has a bipolar disorder, a medically determinable impairment that is a "severe"[*sic*] based on the requirements in the Regulations.

3.  The claimant's impairment does not meet or medically equal any impairment listed in Appendix 1, Subpart P, Regulation No. 4.

4.  The claimant's allegations regarding limitations and symptoms of a disabling severity are not credible for reasons set forth in the body of the decision.

5.  The medical opinions regarding the severity of claimant's impairments have been carefully considered.

6.  The claimant's residual functional capacity is unlimited physically and mentally allows at least simple task completion in socially restricted vocational settings.

7.  Giving claimant the benefit of doubt [*sic*], she is unable to perform past relevant work.

8.  The claimant is of a younger age, has an eleventh grade education, and lacks acquired transferable work skills.

9.  Considering claimant's residual functional capacity, vocational factors, and probative testimony from a vocational expert, jobs exist in significant numbers in the economy that claimant can perform, including those of assembler, packager, and sorter; accordingly, she is not disabled within the framework of rule 204.00 in Appendix 2.

10.  The claimant was not under a "disability," as defined in the Social Security Act, at any time relevant.

(R. at 21-22.)

## III. Discussion

### A.    Standard of Review

This Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free of legal error." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002) (citing 42 U.S.C. §405(g)). Substantial evidence is evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing the ALJ's decision under the substantial evidence standard, this Court will not reweigh the evidence or substitute its judgment for the judgment of the Commissioner. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). However, this Court will not act as a "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). Rather, this Court must ensure that the ALJ has articulated his analysis of the case at some minimal level. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ's decision must build "an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation and citation omitted). It also requires that the ALJ "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2002). If the ALJ's decision does not meet these minimum requirements because the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review," this Court will reverse and remand the decision. *Steele*, 290 F.3d at 940.

## B. The Five-Step Inquiry for Benefits Determination

In order to qualify for disability benefits, a claimant must demonstrate that she is disabled. An individual is considered to be disabled when she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A claimant is considered to be "unable to engage in substantial gainful activity" when she is unable to perform her previous work or engage in any other kind of substantial work that exists in the national economy. 42 U.S.C. § 423(d)(2)(A). In order to determine whether a claimant is disabled under the statute, the ALJ employs a five-step inquiry:

> In the first step the ALJ considers the applicant's present work activity. Second, the ALJ weighs the severity of the applicant's impairment. The impairment or combination of impairments must severely restrict an applicant's physical or mental ability to perform basic work activities or an ALJ should enter a finding of not disabled. Third, the ALJ decides whether the impairment or combination of impairments meets or equals an impairment listed within the regulations which are conclusively disabling. If an ALJ is unable to make a disability determination in the first three steps, then the process proceeds to an assessment of the applicant's residual functional capacity (RFC). At the fourth step, the ALJ determines whether the RFC prevents the applicant from performing his or her past relevant work. If not, in the fifth and final step the ALJ uses the assessment of RFC to determine if the applicant can make an adjustment to other work based on the applicant's age, education, and work experience.

*Arnold v. Barnhart*, 473 F.3d 816, 820-21 (7th Cir. 2007) (internal citations omitted). The claimant has the burden of proof as to the first four steps, while at step five the burden shifts to the Commissioner to show that the claimant's residual functional capacity allows her to do some work within the national economy. *Clifford*, 227 F.3d at 868.

In this case, the ALJ found that Goldsberry was not engaged in substantial gainful activity. (R. at 21.) While the ALJ found that Goldsberry's bipolar disorder was a "severe" impairment, he found at step three of the inquiry that Goldsberry's impairment did not "meet or medically equal" any listed impairment. (Id.) At step four, the ALJ found that Goldsberry was without physical limitations and that she retained the mental capacity necessary for "simple task completion in socially restricted vocational settings." (Id.) Based on this determination of her functional capacity, the ALJ determined that she was not capable of performing past relevant work. (Id.) However, at step five, the ALJ found that Goldsberry was not entitled to disability benefits because she was capable of making an adjustment to several jobs within the national economy. (Id.)

### C. Analysis

Goldsberry challenges the ALJ's decision on several grounds. First, Goldsberry argues that the ALJ committed reversible error by denying her request for a subpoena for her records from Elgin State Hospital. Second, she argues that the ALJ's step three determination was patently wrong. Next, Goldsberry argues that the ALJ's determination that her testimony was not credible was patently wrong. Finally, she argues that the ALJ was patently wrong in determining her residual physical and mental capacity and that his step four and step five determinations were patently wrong. The Court addresses these arguments in turn.

## 1. Denial of Subpoena Requests

Goldsberry's attorney made three requests for a subpoena for records related to the three occasions on which Goldsberry recalls being admitted to Elgin State Hospital. (R. at 185-89.) In making these requests, Goldsberry's attorney stated that repeated attempts to obtain the records had failed and that the documents were important because they would demonstrate "the duration and severity of the in-patient experience," "the diagnoses and prognoses that were obtained," and "the observations of the health-care provider . . . as to Ms. Goldsberry's condition." (R. at 187.) The ALJ denied these requests, noting that Goldsberry's last hospitalization was in 1997, that she had been gainfully employed until 2001, and that her symptoms were controlled by her medication. (R. at 18.) Goldsberry argues that this denial constitutes reversible error.

20 C.F.R. § 416.1450(d)(1) authorizes an ALJ to issue a subpoena when it is "reasonably necessary for the full presentation of a case." Therefore, "[t]he party requesting a subpoena must 'state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena.'" *Butera v. Apfel*, 173 F.3d 1049, 1057 (7th. Cir. 1999) (quoting 20 C.F.R. § 416.1450(d)(2)). As the plain language of the regulation indicates and *Butera* makes clear, there is no absolute right to a subpoena. The burden of establishing that a subpoena is necessary to the full presentation of the case lies with the claimant, and the decision whether additional evidence is necessary for a "full and true disclosure of the facts" is within the discretion of the ALJ. *Butera*, 173 F.3d at 1058 (quoting *Copeland v. Bowen*, 861 F.2d 536, 539 (9th Cir. 1988)).

Goldsberry argues that she made the necessary showing that important facts could not be proven without a subpoena. (Pl.'s Mot. at 9.) Goldsberry's subpoena request indicated that the

- 16 -

hospital records were necessary to show the duration and severity of her hospital experience, the diagnoses she was given at the hospital, and the observations of healthcare providers at the time. (R. at 187.) However, as the ALJ noted, the most recent hospital visit was in 1997, between four and five years (depending on the exact date, which remains unknown) before Goldsberry filed for SSI and seven to eight years before the ALJ's decision. Goldsberry's condition at that early date is not an "important" fact in determining whether she was disabled as of May 2001.

In her brief, Goldsberry argues that the hospital records are relevant to issues such as the symptoms she experiences as a result of her illness, the severity of her symptoms, or her tendency to improve and then regress. (Pl.'s Mot. at 8-9.) As the regulations state, and the Commissioner points out, the applicable standard in issuing subpoenas is not relevancy, but necessity. 20 C.F.R. § 416.1450(d)(1). The Commissioner properly denied the request because the hospital records were not "necessary" to proving the nature and severity of Goldsberry's symptoms or her fluctuating level of mental health over time. First, Goldsberry herself was able to testify on two occasions and answer questions regarding her mental health symptoms and the progress of her illness. Furthermore, the record available to the ALJ contained detailed notes compiled by her psychiatrist, Dr. Rao, on a more or less monthly basis over the period from October 2000 to October 2004. Given the existence of these much more direct sources of information, it cannot be said that the hospital records were necessary to prove any important fact in this case. Consequently, the ALJ did not abuse his discretion in denying Goldsberry's request for subpoenas.

- 17 -

## 2. The ALJ's Step Three Determination

Goldsberry next argues that the ALJ's step three determination was patently wrong, requiring reversal. In order to be upheld as supported by substantial evidence, the ALJ's decision must minimally articulate his analysis of the case; it need not discuss every piece of evidence. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). The ALJ's decision must build "an accurate and logical bridge from the evidence to [his] conclusion." *Steele*, 290 F.3d at 941. Thus, the Seventh Circuit has held that a decision should be remanded to the ALJ when the ALJ's explanation is so perfunctory that it "frustrates any attempt at judicial review." *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003).

Goldsberry argues that the ALJ's determination must be reversed because "[t]he ALJ does not mention any listing by name or undertake any independent evaluation," and accuses the ALJ of failing "to inquire and analyze any listed impairment(s)." (Pl.'s Mot. at 9,10.) Goldsberry further alleges that the ALJ failed to employ "the Commissioner's special technique," which applies in cases where a claimant alleges a mental impairment. (Pl.'s Mot. at 10.) These claims are plainly false. The ALJ's statement that Goldsberry's impairment does not meet or equal any listing is followed by a specific reference to Listing 12.04 as well as two paragraphs of analysis in which the ALJ assesses Parts A, B, and C of Listing 12.04 in light of the findings contained in the PRTF that was completed by Dr. Brister. (R. at 18-19.) The ALJ found that Goldsberry met Part A of Listing 12.04 but that her functional limitations did not meet Parts B or C of the listing. In making this finding, the ALJ specifically discussed the functional categories—"activities of daily living," "social functioning," "concentration, persistence, and pace," and "episodes of decompensation"— required by the Commissioner's special technique. *See Witt v. Barnhart*, 446

F. Supp. 2d 886, 898 (N.D. Ill. 2006) (discussing the special technique applicable to cases involving mental impairments).

Goldsberry's arguments are not only unpersuasive, but also factually unfounded. The ALJ carried out his duty to specify a listing and consider whether Goldsberry's symptoms met or equaled it. He provided specific reasons and considered the functional categories prescribed for cases involving mental impairments under 20 C.F.R. § 404.1520(a). The analysis was not "perfunctory" and it provided the necessary "logical bridge" between facts and conclusions. Therefore, the Court finds that the ALJ's step three determination is supported by substantial evidence.

### 4. Physical RFC, Mental RFC, Step Four and Step Five Determinations

Goldsberry next alleges that the ALJ's determination of her physical and mental RFC and his step four and step five determinations are patently wrong. Two of these arguments can be disposed of immediately. First, the ALJ found at step four that "[g]iving claimant the benefit of doubt [*sic*], she is unable to perform past relevant work." (R. at 21.) The Court assumes that Goldsberry does not wish to attack the ALJ's favorable finding on this issue, and does not address it further. Goldsberry also challenges the ALJ's finding that, because there is no evidence of physical impairment, Goldsberry can physically perform heavy work. (R. at 20.) Notwithstanding his statement that Goldsberry can perform heavy work, the ALJ based his ultimate finding that Goldsberry is not disabled on the opinion of the VE, who assumed that

Goldsberry required "sedentary" employment. (R. at 362 ("I cited sedentary jobs, for those numbers, but there are also those jobs at the light and medium [*sic*].").) Therefore, even if the ALJ's determination of Goldsberry's physical RFC were erroneous, it had no effect on the ultimate outcome and would not require reversal. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (multiple errors by ALJ did not require reversal where they did not ultimately impact the outcome of the decision).

Goldsberry's remaining challenges address the ALJ's determination of her mental RFC and his determination at step five that there were jobs within the national economy that she could perform with her RFC. In determining Goldsberry's mental RFC, the ALJ rejected the opinion of Dr. Rao, Goldsberry's treating physician, and relied on the assessment of Goldsberry's mental impairments given by the DDS physicians who evaluated her case. (R. at 20.) The ALJ then made his step five determination based on the VE's testimony about the vocational outlook of a person who suffered from the impairments indicated in the DDS physicians' reports. (R. at 20, 361-62.) Both determinations hinged, therefore, on the relative weight given to the opinions of Dr. Rao and the DDS physicians. The crux of Goldsberry's argument is that Dr. Rao's opinion was entitled to controlling weight and that the ALJ's discussion of Dr. Rao's opinion "does not rise to the level of consideration and evaluation." (Pl.'s Mem. at 12.) The Court disagrees.

Addressing the role of the treating physician's opinion in the ALJ's disability determination process, the Seventh Circuit has held that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances. . . . A treating physician's opinion . . . is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the

- 20 -

record." *Clifford*, 227 F.3d at 870. Despite this deference to the treating physician, however, the ultimate issue of disability must be determined by the ALJ. *Id.*

In his opinion, the ALJ recognized that the treating physician's opinion is normally entitled to controlling weight under SSR 96-2p. (R. at 20.) However, the ALJ engaged in meaningful substantive analysis of Dr. Rao's opinion and provided several reasons for his determination that it was not entitled to controlling weight in this case. The ALJ determined that Dr. Rao's opinion that Goldsberry was disabled was inconsistent with extrinsic evidence, such as her employment until June 2001. (Id.) The ALJ also found internal inconsistencies in Dr. Rao's reports, noting that he had given Goldsberry a GAF score that indicated only moderate symptoms in the same December 2003 questionnaire in which he stated that she was disabled. (Id.) Finally, the ALJ found that Dr. Rao's October 2004 statement that Goldsberry's condition had become more severe was not supported by documentary evidence. (Id.)

In reviewing the ALJ's decision, this Court will not reweigh the evidence that the ALJ has already evaluated. In this case, the Court is satisfied that the ALJ took into account Dr. Rao's opinion as well as the opinion of the DDS physicians. Although Dr. Rao is the treating physician, the presumption that his opinion is entitled to controlling weight does not apply if his opinion was contradicted by substantial evidence or not supported by medical findings. *Clifford*, 227 F.3d at 870. The ALJ provided a reasoned explanation for his determination that Dr. Rao's opinion was not entitled to the controlling weight that a treating physician's opinion ordinarily receives, pointing to inconsistencies with other evidence in the record and a lack of evidentiary support for some of Dr. Rao's opinions. Therefore, the ALJ did not commit reversible error by crediting the DDS physicians' assessment of Goldsberry's impairments over Dr. Rao's opinion.

Based on the DDS physicians' opinion, the ALJ concluded that Goldsberry had moderate limitations in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; and to interact appropriately with the general public. (R. at 20.) His determination at step five that Goldsberry could perform jobs existing in the economy was based on the VE's testimony about the vocational outlook of a person with the limitations that the DDS physicians found in Goldsberry. (Id.) Because the ALJ's decision to rely on the DDS physicians' opinion in formulating Goldsberry's mental RFC was proper, so too was his reliance on the VE's testimony about the vocational outlook of a person that RFC. Because the ALJ's mental RFC determination and step five determination were based on substantial evidence and were not patently wrong, they must be upheld.

### 4. The ALJ's Credibility Determination

Goldsberry's final argument for reversal is that the ALJ's credibility determination "is fatally flawed because it fails to comply with the specificity required by SSR 96-7p." (Pl.'s Mot. at 11.) Goldsberry also takes issue with the ALJ's reasoning, arguing that he impermissibly "played doctor" when he determined that her symptoms were attenuated by medication. (Id.) Finally, Goldsberry takes issue with the ALJ's finding that a trip she took to Mexico with her boyfriend in 2001 undermined her credibility in claiming an impairment of disabling severity. (Id.)

An ALJ's credibility determination is a finding of fact, and, as such, is entitled to special deference from a reviewing court. *Scheck*, 357 F.3d at 703. Because the ALJ is in the best

position to observe witnesses and determine their truthfulness, the Court will only overturn the ALJ's credibility determination if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). SSR 96-7p requires the ALJ to specify the reasons for his credibility determination "so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). The Court reviews the reasons given by the ALJ in a "common-sensical" fashion rather than "nitpicking" at them; however, the ALJ must still "build a logical bridge" between the record and his conclusions, and the Court must reverse where the ALJ's reasons are "without support in the record or are patently insufficient to support his conclusion." *Shramek*, 226 F.3d at 811-12.

The ALJ gave three reasons for his finding that "[Goldsberry's] testimony, to the extent she is alleging symptoms and functional limitations of a disabling severity on and after the date of the application, is not credible." (R. at 19.) First, the ALJ observed that "the last of her three hospitalizations was in 1997, approximately 8 years ago, showing that her symptoms are at least attenuated by her medication." (Id.) Second, he noted that she engaged in substantial gainful activity by working as a bartender for one and one-half years ending in June 2001, and that her employment ended as a result of harassment by her supervisor rather than because of her bipolar disorder. (Id.) Finally, the ALJ wrote that "[t]reatment records also report on February 22, 2001 that the claimant was looking forward to going to Mexico with her boyfriend and on March 22, 2001, that the trip went well." (Id.)

The Court reiterates that its duty in reviewing the ALJ's decision is not to reweigh the evidence or substitute its judgment for that of the ALJ. *Clifford*, 227 F.3d at 869. However, the

Court must reverse and remand where the ALJ's conclusions are not supported by substantial evidence that "a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. 401. In this case, the ALJ provided specific reasons for his finding that Goldsberry's testimony was not credible, as required by SSR 96-7p. However, the Court finds that these reasons are insufficient to support the conclusion that Goldsberry's testimony about her disabling symptoms was not credible.

Goldsberry testified in November 2003 and December 2004 regarding a long-standing mental illness, claiming that she was disabled beginning in May 2001. Because her testimony related primarily to her period of alleged disability beginning in May 2001, the Court does not understand how evidence that Goldsberry may have taken a trip to Mexico with her boyfriend in February 2001 (before the period covered by the testimony) could undermine her credibility at all. Furthermore, the Court does not believe that Goldsberry's ability to take and enjoy this vacation is logically inconsistent with her claimed disability. The Commissioner argues in his brief that this evidence "highlighted inconsistencies in her testimony that she never went anywhere and did not enjoy going out." (Def.'s Mem. at 12.) However, Goldsberry's testimony about her daily activities related to her lifestyle at the time of her testimony and her day-to-day activities. (R. at 341, 388, 395, 396-97). Testimony that she "never went anywhere" and "did not enjoy going out" in 2003 or 2004 is not necessarily inconsistent with her having gone somewhere and enjoyed it on one occasion in early 2001. The Seventh Circuit has stated that "[t]he many interviews and forms required to apply for disability benefits should not be viewed as traps for slightly varied accounts of daily activities." *Powers v. Apfel*, 207 F.3d 431, 435 (7th

Cir. 2000). Here, any conflict between Goldsberry's testimony and the 2001 trip to Mexico is so *de minimis* that it cannot serve as a basis for discrediting her testimony.

The Court has similar reservations about the other bases the ALJ provided for his conclusion that Goldsberry's testimony was not credible. The ALJ's opinion observes that Goldsberry was employed as a bartender until June 2001. (R. at 19.) The mere fact that Goldsberry was gainfully employed prior to the alleged onset of her disability should not automatically lessen the credibility of her testimony; indeed, it seems likely that many disability claimants are employed prior to becoming disabled. The ALJ also relies on his conclusion that Goldsberry's employment as a waitress ended because she was harassed by her supervisor and not as a result of her mental illness. (Id.) While Goldsberry did testify that her supervisor had harassed her and was supposed to apologize to her, she also testified that she quit because her supervisor "wouldn't give me $5 bills, I needed them, I was so busy . . . I mean it was crazy. And that was it, I started crying, I couldn't take it anymore and I walked out." (R. at 383.) This testimony seems consistent with specific symptoms, such as difficulty handling stress and dealing with other people, that Goldsberry alleges are part of her disability. Because the inconsistency that the ALJ identified is "without support in the record," this Court cannot accept it as a basis for his conclusion that Goldsberry's testimony was not credible. *Shramek*, 226 F.3d at 812.

The final basis for the ALJ's credibility determination is Goldsberry's history of hospitalization. The ALJ's decision states: "[T]he last of her three hospitalizations was in 1997, approximately 8 years ago, showing that her symptoms are at least attenuated by medication." (R. at 19.) As a preliminary matter, the Court finds it curious that the ALJ determined that

- 25 -

documentation of Goldsberry's trips to the hospital was unnecessary in denying her request for a subpoena, and then relied on the time elapsed since Goldsberry's last hospitalization to conclude that her symptoms were "attenuated" by medication. Without knowing what those records might reveal about Goldsberry's condition and prognosis, it seems highly speculative—as well as unfair—to reach such a significant conclusion based on the mere fact that eight years had elapsed since her last hospitalization. Furthermore, assuming for the sake of argument that the fact that Goldsberry had not been hospitalized for eight years indicated some attenuation of her symptoms, this would not necessarily show that she is not disabled. Even if her medication helps her enough that she does not need to be hospitalized, she may still experience serious symptoms that could prevent her from "engag[ing] in any substantial gainful activity," which is the ultimate point of the disability inquiry.

The reasons that the ALJ gave for his determination that Goldsberry's testimony was not credible, as he articulated them, are insufficient to support his conclusion. While the ALJ indicated specific bases for his findings, as required by SSR 96-7p, the Court finds that he did not articulate the reasoning that links the facts on the record to his conclusions and provides the necessary "logical bridge" that would allow his determination to stand. Furthermore, the issue of Goldsberry's credibility is crucial to this case. At the December 8, 2004, hearing, the VE indicated that if Goldsberry's testimony regarding her symptoms were true, the symptoms would be so severe as to preclude Goldsberry from working. (R. at 363.) This testimony makes it clear that the credibility of Goldsberry's testimony about the effects of her bipolar disorder has a potentially decisive influence on the outcome of this case. Therefore, the Court must reverse the

ALJ's decision and remand the case for reconsideration of the credibility of Goldsberry's testimony.

## IV. Conclusion

For the reasons stated above, Goldsberry's Motion to Reverse the Final Decision of the Commissioner is granted in part and denied in part. The Commissioner's Motion for Summary Judgment is denied. The Court remands this case to the Commissioner for further proceedings consistent with this opinion.

### ENTER ORDER:

**MARTIN C. ASHMAN**

Dated: October 16, 2007.                         United States Magistrate Judge

Copies have been mailed to:

ASHLEY S. ROSE, Esq.
Law Offices of Ashley S. Rose
799 Roosevelt Road
Building 6, Suite 104
Glen Ellyn, IL 60137

MR. JAMES M. KUHN, SR.
Assistant United States Attorney
219 South Dearborn Street
Chicago, IL 60604

Attorney for Plaintiff

Attorney for Defendant